2023 IL App (1st) 221954-U

SECOND DIVISION
October 31, 2023

No. 1-22-1954

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| PAULA HERNANDEZ, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County |
| | ) | |
| v. | ) | 2020-L-008552 |
| | ) | |
| CITY OF CHICAGO, and SKYLINE MANAGEMENT GROUP, | ) | Honorable |
| | ) | Gerald Cleary, |
| Defendants-Appellees. | ) | Judge Presiding |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**O R D E R**

¶ 1     *Held*:  Circuit court did not err in granting municipality and its airport property manager summary judgment against business invitee's personal injury suit alleging her slip and fall in airport restroom resulted from spots of water on floor, where plaintiff had no evidence of defendants' actual or constructive notice of water on floor.

¶ 2     This appeal arises from Paula Hernandez's negligence and premises liability suit in which she alleged that while traveling through Chicago's O'Hare International Airport, she was injured when she slipped and fell as a result of an accumulation of water on a restroom floor. After considering the deposition transcripts of Hernandez and a Terminal 5 airport cleaning supervisor, the circuit court granted summary judgment to the City of Chicago and its property manager, Skyline Management Group (Skyline Management). Hernandez argues that summary judgment

should not have been granted when there were genuine issues of fact as to whether Chicago and Skyline Management had actual or constructive knowledge of the dangerous condition of the restroom floor.

¶ 3    Hernandez testified at her deposition that she was at the airport at around noon on October 22, 2019, for a return flight from Chicago to her home in Austin, Texas. She was traveling with her son, daughter-in-law, and granddaughter, and had been in Chicago with family for her granddaughter's fifteenth birthday celebration. After going through security screening, Hernandez and her granddaughter decided to use the restroom. Hernandez entered the women's restroom, walked past a row of sinks on her left, turned right, walked down a hallway, and then entered a stall that faced the hallway. (One of the two photos attached to the defendants' motion for summary judgment depicts a row of stall doors that are opposite a row of sinks, and the second photo depicts a row of stall doors that are opposite a row of frosted windows. Therefore, it appears that the "hallway" Hernandez said that she walked through was the corridor formed between the stalls and frosted windows, and that she would have travelled a path from the restroom entryway to the stall that she chose, by first entering the restroom, walking past the row of stalls that faced the sinks, and then taking two right turns to enter the row of stalls that faced the windows.) The restroom was not crowded at the time. The only people there were Hernandez, her granddaughter, and a "flight attendant" who had entered with or just before them.

¶ 4    Hernandez testified that as she walked, she observed "some water, like, near the sinks," but when later asked, "Did you see any water on the ground anywhere as you walked past the sinks?," Hernandez said, "No. I didn't see any water." Also, when the question was, "did you see any water or substance on the floor while you were going toward the toilet stall before using it,"

Hernandez answered, "I didn't see water. I didn't see water at all."

¶ 5    After using the facilities, Hernandez exited the stall, turned left, and fell down after "[taking] [m]aybe two steps. It was almost immediately." She "just slipped and fell. It was out of the blue." Hernandez testified, "I didn't see any water. I was walking [closer to the stalls than to the windows], but I didn't see any water around there."

¶ 6    After Hernandez fell, she saw that the flight attendant "was already standing there" and then Hernandez's granddaughter quickly exited her stall and came to Hernandez's assistance. During her deposition in October of 2021, nearly two years after her travels, Hernandez could not recall whether anyone else was in the vicinity ("I don't remember. I don't know.").

¶ 7    Hernandez stated that she was on the floor for about three minutes before her son came into the restroom. She was unable to get up by herself and attributed this inability to "my left side because the stalls were there" and "[on] my right side where I had the surgery[,] I couldn't do it." Hernandez testified that her right knee had been replaced in 2019, that the surgeon told her that her left knee was arthritic, and that she had been treated for left knee pain. (Hernandez also testified that she was disabled by "arthritis in all [her] body" and stopped working before her trip to Chicago in 2019.)

¶ 8    Hernandez said that she fell "[b]ecause there was water, and I didn't realize there was water at that point." Also, "I realized[,] [however,] that there was water when I touched it with my [left] hand." When Hernandez was assisted up, she "looked down and *** saw different spots with water. A little bit of water here, a little bit of water there, a little bit more there. It was all spread out." "Some parts were wet, some parts were dry." When asked to describe the size of these "spots," Hernandez said, "I don't remember the size" and "I don't know." When she got up, the

left side of her body "[b]etween [her] shoulder and [her] arm" was wet and "both *** legs" were wet.

¶ 9    Hernandez could not identify the origin of the water. She did not know if the water trailed from the sinks, only that she felt the water or "dampness" underneath her, where she had fallen. She did not see anything broken in the bathroom that would have caused the water to be on the floor. She did not know how long the water was on the floor.

¶ 10    In the emergency room, she was diagnosed with only bruises. Upon returning to Austin a few days later, she was in pain. The pain on her right side "got better" "[a]round a week later." In 2021, Hernandez had surgery on her left shoulder, and as of her deposition in October of that year, she had limited range of motion in her left shoulder and was continuing treatment for her left knee.

¶ 11    In her three-count complaint, Hernandez sought compensation from Chicago under the theories of negligence and premises liability (counts I and II) and from Skyline Management under the theory of negligence (count III).

¶ 12    The other deponent was Cruzelba Blanco, who testified in late 2022 that the airport property management company had employed her as a cleaning supervisor for nine years. In this capacity, she performed cleaning tasks in the women's restrooms in the airport terminal where Hernandez was injured in 2019 (Terminal 5) and trained new employees.

¶ 13    In 2019, the women's restrooms were cleaned every 40 minutes to one hour, depending on how busy the facility was. The restrooms were never closed and it took longer to clean a restroom when it was busy. Although there was no written company policy, each of the approximately 25 restrooms in Terminal 5 was supposed to be cleaned every hour.

¶ 14    Cleaning included using a wet mop, not a dry mop, and the cleaners would wring out the

wet mop "as best [they] could." "Sometimes" and "not always," however, employees would clean with a wet mop, followed by a dry mop. When asked to explain why a dry mop was used only "sometimes," Blanco explained that some of the bathrooms had different flooring—terrazzo— which was more slippery.

¶ 15     During her deposition, Blanco was shown a photo of a bathroom with "a woman on the floor." We were unable to locate this photo in the record on appeal. We presume that the "woman on the floor" was Hernandez, because Hernandez testified that her granddaughter took photos after the accident. When Blanco was asked whether the flooring in the photo was the type of flooring that would be dry mopped, she responded, "In this bathroom we use a wet mop." Upon further questioning, Blanco confirmed that she meant that the cleaners would "only use a wet mop and not a dry mop" on the flooring in the photo. She was shown "another picture that shows a different area of the bathroom," but Blanco said, "It's the same floor" and "even in that area, no dry mop."

¶ 16     When asked "Have you yourself, in the nine years you've worked at Skyline [Management Group], ever used a dry mop to clean up a wet floor you did not make wet?," Blanco answered, "Yes." She also answered affirmatively when asked whether "it was because the company told you to do it." Also, "there were times that [Blanco] personally, *** back in 2019 in Terminal 5, would use a dry mop to dry off a wet floor in a bathroom, even if [she] didn't make it wet" and this occurred "every time [she] saw a wet floor in Terminal 5 that [she] didn't create."

¶ 17     Blanco was shown a photo that we could not locate in the record and she answered affirmatively to the questions (1) "Does this generally look like one of the bathrooms you would work on in Terminal 5?;" (2) "Was it your understanding that any employee *** back in 2019 [was] instructed to use a dry mop if you saw a floor in Terminal 5 that was wet, as I showed you

in [the photo]?;" (3) "And is it part of the job of the employees *** to check the bathrooms to see if the floors are wet and slippery?;" and (4) "As a supervisor, do you instruct your employees *** to use a dry mop if they encounter the condition shown in the picture [because it could be slippery?." Blanco also agreed when asked, "So you told me you would mark the sheet on the janitor's door if you used a dry mop, right?."

¶ 18    Three "wet floor" signs were "always" left in the Terminal 5 restrooms because "sometimes the people use the – when they wash [their] hands, they get water on the floor." The signs were placed at the restroom entrance, by the sink area, and "between [the] sink and toilet." This practice had been followed throughout Blanco's employment. No additional caution signs were employed when the cleaners were working.

¶ 19    The municipality and property manager attached the two deposition transcripts to a motion for summary judgment in which they argued that Hernandez had no evidence that either (1) any water on the bathroom floor was an unnatural accumulation or that the defendants caused the alleged condition, or (2) that the defendants had actual or constructive notice of any unreasonably dangerous condition. The motion included the two photographs that we described above depicting (1) the row of stalls that was opposite the row of sinks and (2) the separate row of stalls that was opposite the row of windows. After the parties had briefed their arguments, the circuit court granted the motion. Hernandez filed a motion to reconsider, which the court denied. Hernandez then filed this appeal.

¶ 20    The entry of summary judgment is reviewed *de novo*. *Seymour v. Collins*, 2015 IL 118432, ¶ 42. Granting summary judgment is an expeditious but drastic means of disposing of litigation when the moving party's right to judgment is clear and free from doubt. *Seymour*, 2015 IL 118432,

¶ 42. It is the proper resolution of a case when the pleadings, exhibits, affidavits and deposition transcripts on file disclose no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. *Branson v. R & L Investment, Inc.*, 196 Ill. App. 3d 1088, 1090 (1st Dist. 1990). When considering summary judgment, the circuit court is required to construe the record strictly against the moving party and liberally in favor of the nonmoving party. *Seymour*, 2015 IL 118432, ¶ 42. Consequently, summary judgment should be denied: "(1) if 'there is a dispute as to a material fact' [Citation] (2) if 'reasonable persons could draw divergent inferences from the undisputed material facts' [citation]; or (3) if 'reasonable persons could differ on the weight to be given the relevant factors' of a legal standard [Citation]." *Seymour*, 2015 IL 118432, ¶ 42.

¶ 21    Hernandez argues that summary judgment was not justified because she established a *prima facie* case for premises liability. To succeed on a claim of negligence, the plaintiff must plead and prove the existence of a duty, a breach of that duty, and damages proximately caused by the breach. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430 (2006). Business owners owe their invitees a duty to maintain the premises in a reasonably safe condition to avoid injuring them. *Olinger v. Great Atlantic & Pacific Tea Co.*, 21 Ill. 2d 469, 473 (1961); *Marshall*, 222 Ill. 2d at 437. A claim of premises liability requires not only the three elements of ordinary negligence, but also three additional elements that include "[(1)] that there was a condition on the property that presented an unreasonable risk of harm, ([2]) that the defendant knew or reasonably should have known of the condition and the risk, and ([3]) that the defendant could reasonably have expected people on the property would not realize, would not discover, or would fail to protect themselves from the danger." (Emphasis omitted.) *Garcia v. Goetz*, 2018 IL App (1st) 172204, ¶ 31.

"Generally, an employee's knowledge of a dangerous condition or spilled substance on the premises is considered sufficient to impute notice to a defendant employer, because an employee has a responsibility either to correct the unsafe condition or clean the spilled substance from the floor, or report the problem to *** superiors." *Pavlik v. Wal-Mart Stores, Inc.*, 323 Ill. App. 3d 1060, 1065-66 (2001).

¶ 22    Illinois courts follow section 343 of the Restatement (Second) of Torts, which states the well-settled law "regarding liability of landowners where a defect or danger on the premises, not created by the landowner or its agents, is alleged":

" 'A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.' " *Tomczak v. Planetsphere, Inc.*, 315 Ill. App. 3d 1033, 1037-38 (2000) (quoting *Genaust v. Illinois Power Co.*, 62 Ill. 2d 456 (1976) (adopting Restatement (Second) of Torts § 343 (1965))).

¶ 23    Hernandez's appeal turns on the following proposition: breach of duty to a business invitee injured by slipping on a foreign substance on the premises can be shown if "(1) the substance was placed by the negligence of the proprietor or (2) his servant knew of its presence or (3) the substance was there a sufficient length of time so that, in the exercise of ordinary care, its presence should have been discovered, *i.e.*, the proprietor had constructive notice of the substance." *Hayes*

*v. Bailey*, 80 Ill. App. 3d 1027, 1030 (1980) (*citing Blake v. Dickinson*, 31 Ill. App. 3d 379 (1975)). If the plaintiff is relying on the theory of constructive notice of the substance, then the time element to establish that notice becomes critical and the plaintiff bears the burden of showing that the foreign substance was on the floor long enough to give constructive notice to the proprietor. *Hayes*, 80 Ill. App. 3d at 1030; *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 650-51 (7th Cir. 2014) (under Illinois law of constructive knowledge, length of time that allegedly hazardous substance existed before plaintiff's injury is "of critical importance" (internal quotation marks omitted)); *Heider v. DJG Pizza*, 2019 IL App (1st) 181173, ¶ 34 (constructive notice may be proven by demonstrating that a condition existed for an extended period of time, meaning that the defendant could have discovered the condition by the exercise of reasonable care).

¶ 24    Precedent that illustrates these principles includes *Hayes*, in which a patron of a restaurant excused herself to use the women's restroom and upon emerging from one of the toilet stalls, slipped and fell, injuring her back. It was only after she was on the floor that she noticed that there was a puddle of water and that she was wet. *Hayes*, 80 Ill. App. 3d at 1030. She sued the building tenant who was responsible for maintaining the restroom and had not inspected the facilities for more than two hours before her accident. *Hayes*, 80 Ill. App. 3d at 1029. At the conclusion of her evidence, the judge granted the tenant's motion for a directed verdict on the issue of liability, because the plaintiff presented no evidence as to how long the water had been on the floor or how it got there. *Hayes*, 80 Ill. App. 3d at 1030. The appellate court affirmed the decision, explaining:

"It is entirely possible that the floor did not get wet until just before plaintiff walked into the restroom. The water could very easily have accumulated on the floor [during the preceding 20 minutes]. In fact, it is possible that the water was on the floor because of

plaintiff's use of the restroom.

*** [I]n the absence of any evidence showing that the water had been on the floor a substantial period of time, *** there is no evidence that defendant's failure to inspect the restroom [20 minutes earlier] was what allowed the water to accumulate and remain on the floor and possibly cause the plaintiff to slip and fall. Therefore, there was no evidence of proximate cause and the trial judge was correct in directing a verdict[1] for the defendant."

*Hayes*, 80 Ill. App. 3d at 1031.

¶ 25    *Tomczak* is another instance of a patron who slipped and fell, this person was skating at an indoor rink. *Tomczak*, 315 Ill. App. 3d 1033. During her deposition, she testified that while taking a "concession break," she saw another skater slip and almost fall on the rink floor on what appeared to be a water puddle approximately 18" in diameter and that someone had then wiped up the water with a towel. *Tomczak*, 315 Ill. App. 3d 1035. She resumed skating, and after "some turns around the rink," she slipped and fell, fracturing her elbow. *Tomczak*, 315 Ill. App. 3d 1035. She testified that she had fallen where the other skater had fallen and that she noticed a puddle of water in the area which she had not seen before she fell. *Tomczak*, 315 Ill. App. 3d 1035. She was unable to state how long the puddle had been there:

"Q. Would it be fair to say that that puddle could have been there anywhere from ten

---

[1] A summary judgment and a directed verdict are similar rulings that occur at different stages of litigation. "A directed verdict *** is properly entered in those limited cases where all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on that evidence could ever stand." (internal quotations omitted) *Perfetti v. Marion County*, 2013 IL App (5th) 110489, ¶ 14. When contemplating a directed verdict, the trial judge neither weighs the evidence nor considers the credibility of the witnesses, but considers the evidence, and any inferences therefrom, in the light most favorable to the party opposing the motion. *Perfetti*, 2013 IL App (5th) 110489, ¶ 14. A directed verdict should be granted if "there is a total failure or lack of evidence to prove any necessary element of the plaintiff's case." *Perfetti*, 2013 IL App (5th) 110489, ¶ 15.

1-22-1954

seconds to ten minutes, you just don't know?

> A. I don't know that." *Tomczak*, 315 Ill. App. 3d 1035.

¶ 26 Furthermore, she was unable to identify the source of the water. She attributed the puddle to a skylight immediately overhead, but she was not aware of any leaks from the skylight or drips from the ceiling. *Tomczak*, 315 Ill. App. 3d at 1035. Her skating companion and the rink employee who was on duty at the time were also deposed and neither of them was aware of any water coming from that area. *Tomczak*, 315 Ill. App. 3d at 1036.

> "Q. Do you have any information whatsoever as to where this water came from?
>
> A. Other than from the roof, from the sky, from the ceiling, overhead pipes, I don't know.
>
> Q. What makes you think that the water came from overhead?
>
> A. There was nobody skating around with drinks in their hands. Logically speaking, it—
>
> Q. Would it be fair to say that you're guessing that the water came from the roof or from overhead?
>
> A. Yes.
>
> Q. But on your own personal knowledge, can you tell me, based upon anything you observed, either before or after your fall, where the water was coming from?
>
> A. I don't know that." *Tomczak*, 315 Ill. App. 3d at 1030.

¶ 27 Thus, by the plaintiff's own admission, the water was there for an unknown period of time, a period that was even "too short for her to have observed it during her passes around the rink" and she had no evidence as to how long it had been there. *Tomczak*, 315 Ill. App. 3d at 1040. The

circuit court's grant of summary judgment to the defendant was affirmed on appeal by a court which concluded, "It follows that such a short passage of time was insufficient to give notice to defendant [of an unsafe condition]. Without notice, actual or constructive, liability will not attach[.]" *Tomczak*, 315 Ill. App. 3d at 1040.

¶ 28    Similarly, in *Reid*, a department store patron slipped and fell, purportedly on a partially melted milkshake on the tile floor, and sustained minor injury. *Reid v. Kohl's Department Stores, Inc.*, 545 F.3d 479, 482 (2008). She testified that because of the consistency of the substance, " '[i]t appeared to me that it may have been down there for some time because it was starting to get liquid in some areas of the spillage. It was liquid and running a little bit.' " *Reid*, 545 F.3d at 482. The friend who was shopping with her that day testified, however, that in his opinion, the spill had " 'just happened [because] it seemed to be ice cream, and it hadn't melted yet.' " *Reid*, 545 F.3d at 482. Neither their testimony nor their photographs of the spillage indicated with any certainty how long the milkshake had been on the floor. *Reid*, 545 F.3d at 482. The only definite statement about the length of time came from the store manager who came to the plaintiff's assistance after the fall. *Reid*, 545 F.3d at 482. According to the manager, the milkshake had been in the aisle for 10 minutes at the most before the plaintiff encountered it. *Reid*, 545 F.3d at 482. The district court found that the department store had no actual or constructive notice of the spill and entered summary judgment. *Reid*, 545 F.3d at 482. The appellate court affirmed, reasoning in part that one could only speculate how long the melted beverage had been on the floor. *Reid*, 545 F.3d at 482. The plaintiff had presented no evidence about the beverage's composition and original consistency (was it a milkshake or actually frozen yogurt or a fruit smoothie and was the vendor known for heavy or light shakes), and whether the milkshake had melted on the floor instead of in the cup

before its owner had "unwittingly" dropped or intentionally discarded it on the floor. *Reid*, 545 F.3d at 482.

¶ 29    Hernandez argues that Blanco, the cleaning supervisor, testified that Chicago and its airport property manager had actual notice or, at the very least, constructive notice that the airport restroom floor was wet and slippery. The record, however, does not present a genuine issue of material fact as to whether the defendants had either form of notice that the floor of the restroom that Hernandez visited had a wet, dangerous floor.

¶ 30    Looking first at actual notice, Blanco made only general statements about the conditions in the vicinity of the handwashing sinks in the 25 or so women's restrooms in Terminal 5, and she indicated that all of those facilities were cleaned at least hourly, which included mopping the floors. Blanco was never asked about the condition of the specific restroom that Hernandez and her granddaughter chose to use. Furthermore, she was questioned about "2019" and "October 2019" and not about midday on October 22, 2019, when Hernandez's accident occurred. There is no indication that Blanco was even in the airport that day. Blanco's testimony did not convey facts from which a judge could conclude that Chicago and Skyline Management had actual notice of the dangerous condition where Hernandez fell.

¶ 31    Furthermore, although Hernandez is not relying on her own testimony to establish actual notice, we point out that she is like the roller skater in *Tomczak*, 315 Ill. App. 3d 1033, who did not know how long the water was on the floor and could not identify its origin. Hernandez testified that she saw "some water, like, near the sinks," but upon further questioning, she said that she did not see any water "on the ground anywhere as [she] walked past the sinks" or "while [she was] going toward the toilet stall before using it." Her statement about the stall area where she fell was

a definite denial that there was any water in that part of the restroom prior to her accident. She was also unable to connect the water in the sink area with the area where she fell, which was around the corner from the sinks:

"Q. Well, when you're on the ground now, after the fall, do you remember seeing— from the point when you're on the ground, do you remember seeing any trail of water from the sinks down the hallway?

A. I really don't know. I don't really know if there was a trail of water. I only felt with my hand that it was wet."

¶ 32    The other deponent, Blanco, did not suggest that the hourly mopping that was occurring in every women's restroom was insufficient or that splashes and drips of sink water could have accumulated to the extent that they trailed around the corner to where Hernandez slipped. Instead of a trail, Hernandez testified that when she got up after falling, she "saw different spots with water[.] *** It was all spread out." When questioned further about the size of these "spots," she responded, "I don't remember the size" and "I don't know."

¶ 33    Hernandez's testimony also excluded other possible sources for the water on the floor and indicated that she personally did not know when the water got on the floor:

"Q. Did you see any pipes or anything else broken in the restroom?

A. "I didn't see."

Q. Do you have any idea how long the water on which you slipped was present on the ground? Five minutes, an hour? Any idea?

A. I have no idea. I have no idea."

¶ 34    Neither of the deponents provided facts from which the circuit court could determine that

the defendants had actual notice of an unsafe condition. "[L]iability cannot be imposed *** for the presence of a substance that no one had knowledge of immediately prior to the occurrence. To do so would be to make the owner the insurer of the safety of the plaintiff." *Tomczak*, 315 Ill. App. 3d at 140 (citing *Olinger*, 21 Ill. 2d at 476); *Bonamie v. Welsh*, 95 Ill. App. 3d 349, 350 (1981) ("An owner is not required to protect against the perpetual possibility that a person *** will hurt himself under plain ordinary conditions. To hold otherwise would make every landowner an absolute insurer for all injuries occurring on his premises. Such is not the law.")

¶ 35   The record also fails to show a fact dispute about constructive notice—whether the municipality and airport property manager, in the exercise of ordinary care, should have known that the stall area was wet and thus corrected it before Hernandez was there. Hernandez relies on *Wiegman* and the principle that a fact regarding proximate causation can be established by circumstantial evidence. *Wiegman v. Hitch-Inn Post of Libertyville*, 308 Ill. App. 3d 789, 796 (1999). "Causation may be established by facts and circumstances which, in the light of ordinary experience, reasonably suggest that the defendant's negligence operated to produce the injury." *Wiegman*, 308 Ill. App. 3d at 796.

> "It is *** not necessary that only one conclusion [can be drawn] from the evidence. [Citation.] However, where from the proven facts the nonexistence of the fact to be inferred appears to be *just as probable* as its existence, then the conclusion that it exists is a matter of speculation, surmise, and conjecture, and the trier of fact cannot be allowed to draw it. [Citation.] It has also been stated that a fact cannot be established by circumstantial evidence unless the circumstances are of such a nature and so related to each other that it is the *only probable, not merely possible, conclusion that can be drawn* therefrom.

[Citations.] (Emphasis supplied.) *Wiegman*, 308 Ill. App. 3d at 795-96.

¶ 36 Hernandez contends that the circuit court failed to give adequate consideration to Blanco's testimony. According to Hernandez, Blanco was shown photos of the bathroom taken on the date of the incident "immediately around the time" that Hernandez fell and Blanco testified that her employer knew the floor was consistently wet because handwashers would get water on the floor. We noted earlier that the defendants' motion for summary judgment included two photographs of the bathroom, but that we could not locate the photos that were used in Blanco's deposition. Regardless, Hernandez is overstating the effect of Blanco's testimony, as what she said does not indicate that there was any appreciable accumulation of water that the defendants should have known was present. More specifically, Hernandez erroneously contends that Blanco said that the bathroom floors "were *often wet* due to patrons using the sinks" and that Blanco's testimony leads to the conclusion that, "Water would *often accumulate* on the floor due to both customers using the facility and employees mopping the floor." Emphasis added. But what Blanco actually said was that caution signs were *always* left in the Terminal 5 women's bathrooms "[b]ecause *sometimes* the people use the – when they wash [their] hands, they get water on the floor." (Emphasis added.) Blanco's statement that "sometimes the people *** get water on the floor" is not a basis upon which to conclude that this occurred "often." Furthermore, whether water was "sometimes" or "often" splashed or dripped near the handwashing sinks is irrelevant because Hernandez did not fall near the sinks. She fell coming out of a stall, around the corner and in another "hallway" of stalls that was separate from the area where the handwashing sinks were located. Blanco's statement about people "sometimes **** get[ting] water on the floor" near the sinks does not indicate that water accumulated around the corner in the vicinity of where

Hernandez exited from the stall. This is particularly true when Blanco also testified that every women's bathroom floor in Terminal 5 was being cleaned hourly, which included mopping, and Hernandez testified that she did not see any water before she fell, only noticed "little bits" after she stood up, and could not describe the size of the water "spots" she observed ("I don't remember the size" and "I don't know."). Neither of the deponents could testify whether water had accumulated in the area where Hernandez had her accident.

¶ 37    Hernandez also takes liberty by arguing that Blanco's testimony indicates, "When cleaning the bathrooms, employees were to use two mops, including a dry mop to dry the floors." Blanco said that the dry mop was employed only sometimes, not always, and was not necessary on the type of flooring that Hernandez fell on:

> "Q. What would you or your employees at Skyline do to dry the floors in Terminal 5
>
> for the women's bathrooms back in 2019?
>
> A. We use sometimes two mops, one wet, and one other dry, to dry the floors.
>
> Q. You said sometimes you would use a dry mop?
>
> A. Yes."

¶ 38    The defendants' attorney then asked two questions, to which Blanco gave only one answer, from which it is unclear whether she was answering the first or the second question:

> "Q. What would be the circumstances where you use a dry mop, and what would be
>
> the circumstances where you wouldn't use a dry mop?
>
> A. Because we clean with a wet mop."

¶ 39    It is impossible to tell from just this exchange whether Blanco meant she would dry mop after she had wet mopped (answering the first question) or would not dry mop after wet mopping

(answering the second question). What is certain is that Blanco was not answering both questions, because the questions negate each other–she was not saying that because she cleaned with a wet mop, she would then both dry mop and not dry mop. However, as the deposition continued, Blanco's meaning became apparent. Blanco said that some of the restrooms had terrazzo flooring, and that those restrooms would be wet mopped followed by a dry mop, because terrazzo is "more [of] a slippery floor." Blanco then denied that the flooring visible in certain photos (photos which we presume were the ones taken by Hernandez's granddaughter in or near where Hernandez had fallen) was the type of flooring that would be dry mopped.

¶ 40    Hernandez takes even greater liberty with the idea that it "undisputed that water on the floor of the Terminal 5 bathroom was a dangerous condition" and was "so dangerous here that plaintiff was unable to get up by herself after falling." Hernandez portrays herself like the injured restaurant patron in *Newsom-Bogan v. Wendy's Old Fashioned Hamburgers of New York, Inc.*, 2011 IL App (1st) 092860, who was unable to get up from a tile floor after falling near a trash receptacle and getting grease from the floor onto her hands. Hernandez testified that she was unable to get up by herself, but she did not attribute this inability to the condition of the restroom floor. She testified that her right knee was previously injured, stating, "[on] my right side where I had the [knee replacement] surgery[,] I couldn't do it." She indicated that her whole body had been previously disabled by arthritis, that her left knee was arthritic and that the stalls to her left were what prevented her from getting up in that direction ("on my left side because the stalls were there"). She also said that her left side and both legs became wet or "damp[]" while she laid on the floor, but that the "water that [she] fell on [was] generally under and being covered by [her] body." Hernandez did not testify and it cannot be inferred from any of her testimony that the stall area

was "so dangerous here that plaintiff was unable to get up by herself after falling."

¶ 41    Also, Hernandez incorrectly contends that her own testimony was "but a fraction of the evidence which was before the trial court" because the judge also had benefit of Blanco's testimony and "photographs, documents." However, the parties asked the circuit court to rule on essentially only two deposition transcripts and two photographs. The only photo that Hernandez cites is one of the two photos that the defendants included with their motion (depicting the sink area that was around the corner from the separate set of stalls where Hernandez fell). She does not identify any "documents" and we are not aware of any papers such as records or affidavits that were made available for the circuit court's consideration.

¶ 42    Neither deposition indicates that the floor outside of Hernandez's stall was consistently wet or that she fell on the terrazzo type of flooring that was so slippery that it needed to be dry mopped after being wet mopped. "It is well settled that liability cannot be predicated upon surmise or conjecture as to the cause of an injury." *Wiegman*, 308 Ill. App. 3d at 795.

¶ 43    Ultimately, the record fails to support Hernandez's argument that the circumstantial evidence indicates water often accumulated on the restroom floor to such an extent that the defendants "knew of the dangerous condition" and should have "take[n] affirmative action to protect business invitees from unreasonable risk of harm."

¶ 44    Moreover, a crucial issue when relying on constructive notice is the length of time that the foreign substance was on the premises, and the plaintiff bears the burden of showing that the substance was there long enough that, in the exercise of ordinary care, the defendant should have discovered its presence. *Hayes*, 80 Ill. App. 3d at 1030. Blanco did not testify about the restroom at issue and Hernandez was the only person who testified about her fall. Hernandez did not file

any other witness statements. She testified that she did not see any water near the toilet stalls until after she had fallen when leaving the stall. When she was laying on the ground she saw that the flight attendant "was already standing there" and then Hernandez's granddaughter rushed to her assistance. Hernandez touched various spots with her left hand and felt water or dampness directly underneath her. After standing up, she was able to see "[a] little bit of water here, a little bit of water there." Hernandez is like the restaurant patron on *Hayes* who had no evidence showing that the water she slipped on had been on the floor a substantial period of time such that the defendant should have discovered that it was there. *Hayes*, 80 Ill. App. 3d at 1031. She is also similar to the roller skater in *Tomczak*, 315 Ill. App. 3d 1035, who did not notice puddled water on the rink surface until after she had fallen, and the department store patron in *Reid*, 545 F.3d 482, who could not say how long the milkshake she stepped in had been spilled on the store's floor. Hernandez could not meet her burden of showing the defendants' breach of duty was the proximate cause of her injury.

¶ 45    Hernandez identified no factual evidence that Chicago and Skyline Management Group had actual or constructive notice of a wet surface on the restroom floor where Hernandez fell. She was not expected to prove her case at the summary judgment stage, but she did need to identify facts that would potentially entitle her to recover at trial. A factfinder could only speculate whether there was water just outside the stalls or whether the defendants knew that there was any water in that area of the restroom. Since Hernandez did not factually support the essential elements of her suit, summary judgment for the defendants and against Hernandez was properly granted. For these reasons, we affirm the granting of the defendants' motion.

¶ 46    We also reject Hernandez's contention that her motion for reconsideration of the entry

summary judgment was denied in an abuse of discretion. The purpose of that type of motion is to inform the circuit court of newly discovered evidence, a change in the law, or errors in the court's application of the law. *Hajicek v. Nauvoo Restoration, Inc.*, 2014 IL App (3d) 121013, ¶ 12. The grant or denial of a motion for reconsideration is reviewed for an abuse of discretion. *Hajicek*, 2014 IL App (3d) 121013, ¶ 12. Hernandez sought reconsideration on grounds that the court erred in its application of the law, but the record does not substantiate this argument. We affirm the denial of Hernandez's motion.

¶ 47    The judgment of the circuit court is affirmed.

¶ 48    Affirmed.